UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **LEGENDS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-09-3463** |
| | § | |
| **THE UPPER DECK CO., LLC, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM AND ORDER

In this patent infringement suit, the parties seek construction of several terms contained in the asserted claims of U.S. Patent No. RE 38,044 (the "'044 Patent"). This Court held a hearing on October 13, 2010, during which the parties presented argument in support of their proposed constructions. This Court now construes the disputed claim terms as a matter of law under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

## I.    BACKGROUND

Plaintiff Legends, Inc. is the owner of the '044 patent, which is a reissue of U.S. Patent No. 6,030,001 (the "'001 Patent"). The '044 patent contains fourteen claims that were not in the '001 Patent, and those fourteen claims are at issue in this case. Plaintiff alleges that Defendants The Upper Deck Co., LLC ("Upper Deck") and Collectors Universe, Inc. ("Collectors Universe") (collectively, "Defendants") infringe independent claims 7 and 15 of the '044 Patent and twelve claims that are dependent on those claims.

The claims at issue relate to methods of deterring forgery and authenticating signatures on items. This is useful, Plaintiff contends, in fields in which signatures are valuable, such as wills and sports memorabilia. Claim 7 of the '044 Patent provides:

> A forgery and authentication method for a signature on an item, comprising the steps of:
> a. signing the item by a principal;
> b. registering with a central registrar a facsimile signature of the principal; and
> c. placing an information bearing medium having at least one numbered code on the item with a tamper proof adhesive.

(Doc. No. 39-2, at col. 8, ll. 8-16.) Claim 15 provides:

> A forgery deterrent and authentication method for a signature on an item, comprising the steps of:
> a. signing the item by a principal;
> b. registering with a central registrar a facsimile signature of the principal;
> c. placing an information bearing medium having at least one numbered code on the item with a tamperproof adhesive;
> d. registering the at least one numbered code with the central registrar;
> e. reading the at least one numbered code using the central registrar;
> f. identifying the principal through the at least one numbered code by the central registrar;
> g. identifying the item through the at least one numbered code by the central registrar; and
> h. maintaining a database by the central registrar that identifies the principal and the item.

(*Id.* at col. 8, ll. 40-58.)

## II.  LEGAL STANDARD

Claim construction is a matter of law, and thus the task of determining the proper construction of all disputed claim terms lies with the Court. *Markman*, 517 U.S. at 372. The Federal Circuit has opined extensively on the proper approach to claim construction, most notably in its recent opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

2

The goal of a *Markman* hearing is to arrive at the ordinary and customary meaning of a claim term in the eyes of a person of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. In order to do so, the Court should first look to intrinsic evidence to decide if it clearly and unambiguously defines the disputed terms of the claim. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1585 (Fed Cir. 1996). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314.

Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention. *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co.,* 521 F.3d 1352, 1360 (Fed. Cir. 2008). Thus, the inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. *Phillips*, 415 F.3d at 1313. That starting point is based on "the well-settled understanding that inventors are typically persons skilled in the field of the invention, and that patents are addressed to, and intended to be read by, others of skill in the pertinent art." *Id.* A district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. *O2 Micro Intern.*, 521 F.3d at 1360; *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in non-construction of "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.,* 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in lower court's refusal to construe "irrigating" and "frictional heat").

The claims themselves provide substantial guidance as to the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. To begin with, the context in which a term is used in the asserted claim can be highly instructive. *Id.* Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. *Vitronics*, 90 F.3d at 1582. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Phillips*, 415 F.3d 1303.

In addition, the specification, or the part of the patent where the inventor describes and illustrates the invention in significant detail, "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The importance of the specification in claim construction derives from its statutory role. The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112, ¶ 1. Consistent with that general principle, cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. *Phillips*, 415 F.3d at 316. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive. *Id.* The specification may also resolve ambiguous claim terms that are not sufficiently clear to

permit the scope of the claim to be ascertained from the words alone. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Notably, while the specification may describe very specific embodiments of the invention, the claims are not to be confined to these embodiments. *Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) (quoting *Phillips*, 415 F.3d at 1323). However, the importance of limiting language in the specification has been discussed by the Federal Circuit in terms that favor a restrictive reading. For example, in *Lizardtech, Inc. v. Earth Resource Mapping, Inc.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006), the court stated:

> However, in whatever form the claims are finally issued, they must be interpreted, in light of the written description, but not beyond it, because otherwise they would be interpreted to cover inventions or aspects of an invention that have not been disclosed. Claims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited. One does not receive entitlement to a period of exclusivity for what one has not disclosed to the public.

*See also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) (holding that the meaning of a claim was limited to the single embodiment disclosed in the specification). There is "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

Finally, the prosecution history, which has been designated as part of the "intrinsic evidence," consists of the complete record of the proceedings before the U.S. Patent and Trade Office ("PTO") and includes the prior art cited during the examination of the patent. Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. Yet, because the

prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *Id.* Still, "a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see also Omega Engineering Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (finding that the doctrine of prosecution disclaimer is well established and precludes patentees from recapturing through claim construction specific meanings disclaimed during prosecution). A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art. *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (limiting the term "transmitting" to require direct transmission over telephone line because the patentee stated during prosecution that the invention transmits over a standard telephone line, thus disclaiming transmission over a packet-switched network); *Alloc v. Int'l Trade Comm'n,* 342 F.3d 1361, 1372 (Fed. Cir. 2003) (finding the patentee expressly disavowed floor paneling systems without "play" because the applicant cited the feature during prosecution to overcome prior art); *Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (limiting operation of the "transceiver" to the three stated modes because of clearly limiting statements made by the patentee to try to overcome a prior art rejection).

A court may look to incomplete reexamination proceedings during claim construction. *Proctor and Gamble v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847-48 (Fed. Cir. 2008). However, courts have questioned the probative value of preliminary

reexamination findings by the PTO, noting that the PTO frequently grants requests for reexamination, but infrequently fails to find patentable claims. *See Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 846 F. Supp. 542, 547 (S.D. Tex. 1994), *aff'd*, 78 F.3d 1575, 1584 (Fed. Cir. 1996).

Only if there is still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should a trial court resort to extrinsic evidence, such as expert witness testimony, dictionary definitions, and legal treatises. *See Vitronics*, 90 F3d at 1585. While extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.' " *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). The judicial arbiter must be sufficiently informed so that she may step into the shoes of the ordinary skilled artisan. It is here that the use of extrinsic evidence makes the most sense.

## III.   ANALYSIS OF CLAIM TERMS

The parties disagree about the proper construction of eight terms or sets of terms. The Court will address each in turn.

### A.  Preambles of Claims 7 and 15

The preamble of claim 7 reads, "A forgery and authentication method for a signature on an item, comprising the steps of . . . ." (Doc. No. 39-2, at col. 8, ll. 8-9.) The preamble of claim 15 reads, "A forgery deterrent and authentication method for a signature on an item, comprising the steps of . . . ." (*Id.*, at col. 8, ll. 40-41.)  Thus, the two preambles are identical except that the word "deterrent" appears in claim 15 but not

in claim 7. Plaintiff argues that the preambles do not require construction because they are not limiting. Defendants argue that the preambles do limit the claims, and that they should be construed to mean "A method of making a determination whether a signature on the item is authentic." In addition, Defendants argue that the word "deterrent" should be added to the preamble of claim 7 because its omission was merely a clerical error.[1]

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted). "The effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989); *see also Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.").

The Court finds that the preamble in this case is limiting, as it not only "state[s] a purpose or intended use for the invention" but "is necessary to give life, meaning and vitality to the claim. *See Catalina Marketing*, 289 F.3d at 808. That is because

---

[1] Plaintiff does not dispute that the reason for the omission is a clerical error, but contends that the amendment is unnecessary because the preambles are not limiting.

"authentication" is more than just the *purpose*, it is the *action* needed for the patented method itself, and the claims would not be complete without the word "authentication." *See Application of Bulloch*, 604 F.2d 1362, 1365 (C.C.P.A. 1979) ("The introductory claim language 'stable color developer concentrate' is more than a mere statement of purpose; and that language is essential to particularly point out the invention defined by the claims."). Although "[t]he mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim," *Marrin v. Griffin*, 599 F.3d 1290, 1295 (Fed. Cir. 2010), the word "authentication" in the preambles of claims 7 and 15, not just the words "a . . . method," is needed to "breathe[] life and meaning into the claim." *General Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361 (Fed. Cir. 1999) (preamble limited claim to "bit map display devices"); *see also, e.g. Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1256-57 (Fed. Cir. 1989) (preamble limited claim to "optical waveguides"); *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677-78 (Fed. Cir. 1988) (preamble limited claim to "a base for the support of equipment").

This conclusion is confirmed by the remainder of the patent. The title of the patent ("Method for Deterring Forgeries and Authenticating Signatures") and the "Field of the Invention" description ("The present invention relates to forgery deterrent and authentication systems and methods, and more particularly to forgery deterrent and authentication systems and methods related to signatures.") make clear that those were the primary purposes of the invention.[2] Furthermore, in the Background section, the patentee distinguished prior art by Upper Deck because that system was not "designed to

---

[2] The "Background of the Invention" does state two additional "objects" of the invention, which comprise more specific elements of the claims. (Doc. No. 39-2, at col. 2, ll. 11-18.) There is, however, no suggestion that the inventor intended the patented method to be anything but one of authentication of signatures.

deter the forgery of signatures or to authenticate signatures generally." (Doc. No. 39-2, at col. 1, ll. 51-53; *see In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1347 (Fed. Cir. 2002) ("Clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may indicate that the preamble is a claim limitation because the preamble is used to define the claimed invention.").) The Court acknowledges that the claimed distinction was not that the new invention was the first to authenticate signatures, but rather that it could be used to authenticate signatures *generally* rather than in Upper Deck's market niche and in the presence of Upper Deck representatives. Still, the fact that the patentee distinguished prior art by describing the invention as designed "to authenticate signatures generally" suggests that authentication is a vital component of the invention.

Based on the claim language as well as the specification and prosecution history, the Court concludes that "what the inventors actually invented and intended to encompass by the claim[s]" was a method of authenticating signatures. *See Corning Glass Works*, 868 F.2d at 1257. The preambles thus limit claims 7 and 15 as well as their dependent claims. The Court does not find it necessary to adopt a construction of the preambles because their ordinary meaning is sufficiently clear. The Court does, however, find it appropriate to insert the word "deterrent" after "forgery" in the preamble of claim 7 to fix the typographical error.

### B. "Signature," "Signing," "Signed"

Plaintiff and Upper Deck agree that "signature" should be construed as "the actual signature of a principal placed on a specific item." Collectors Universe contends that "signature" should be construed as "the name of a person written by hand by that person;

or the act of signing one's name by hand on a specific item." Plaintiff argues that "signed" should be construed as "the past tense of signing," while Upper Deck proposes "the past tense of sign." Because Collectors Universe has provided no elaboration for why "the act of signing one's name by hand on a specific item" should be included in this term's construction, the Court declines to include it. Instead, the Court adopts Plaintiff's and the Upper Deck's agreed construction of "signature" as well as the construction of "signed" as "the past tense of signing."

The parties disagree more sharply on the proper construction of "sign" and "signing." Plaintiff argues that "signing" should be construed as "the act of creating a signature." Defendants both argue that "signing" should be construed as:

> The act of creating a signature, exclusive of the witnessing by an agent or another, of the principal signing the item. Such witnessing has been expressly disclaimed by patentee in the specification of the patent.

It is not clear from the briefs or the *Markman* hearing whether Plaintiff actually contends that the mere witnessing of another person signing something is sufficient to constitute a signature, as Defendants claim Plaintiff contends. Regardless, it is clear to the Court that the mere witnessing by one person of another person signing an item does not itself constitute a "signing." Although such a construction should be obvious, the Court will include it in this term's construction in an abundance of caution.

Finally, Plaintiff argues, and Defendants do not dispute, that a "signing" may occur either with or without the presence of another person. (*See* Doc. No. 41, at 11.) The Court agrees that this is in line with the ordinary meaning of "signing" and the context of the patent claims and specification.

Accordingly, the Court construes "signing" as "the act of creating a signature, with or without one or more witnesses present. The mere witnessing by one person of another person signing an item does not itself constitute a 'signing.'"

## C. "Registering," "Registered"

Plaintiff argues that "registering" should be construed to mean "providing the specific facsimile of a principal's signature, along with other information, to the central registrar for recordation/storage." Upper Deck argues that it should be construed as "to make or secure, in a register, official entry or a record of information." Collectors Universe argues that it should be construed as "to make or secure, in a register, official entry or a record of information that is known, assigned, or collected." The parties agree that "registered" should be construed as "the past tense of registering," and so the Court adopts that construction.

Including "facsimile signature," as Plaintiff proposes, is not supported by the context of the claims. Claims 7 and 15 refer several times to *registering a facsimile signature*, which strongly implies that the term "registering" does not inherently include "facsimile signature." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel"). Moreover, claim 15 also refers to *registering at least one numbered code*, which does not seem to include registering a facsimile signature. To read "facsimile signature" into "registering" in that claim element would make no sense. Therefore, the Court finds that including "facsimile signature" in the term "registering" would be redundant and confusing, and declines to do so. For the

same reason, the Court declines to read "to the central registrar" into the term "registering."

The Court does, however, find that the basic wording of Plaintiff's proposed construction accurately captures of the meaning of "registering" in the context of the patent. Accordingly, the Court construes "registering" as "providing information for recordation/storage."

### D. "Central Registrar"

Plaintiff argues that "central registrar" should be construed as "a computer based system that stores the registered information from a principal and then is available to the public to retrieve registration information, including the facsimile signature, and may provide a certificate of authenticity." Defendants argue that it should be construed as "a primary or essential official recorder or keeper of records that are available to be retrieved either physically or via electronic means," and that it need not be *computer-*based. Defendants do not dispute Plaintiff's contention that the central registrar must include the registration of facsimile signatures. (*See* Doc. No. 41, at 23.)

In "interpret[ing] claims in light of the specification" but "avoid[ing] impermissibly importing limitations from the specification," courts should "look[] to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003). Plaintiff argues that each embodiment described in the specification contains a *computer*-based central registrar, so the Court may limit the claims to such a system. *See id.* ("where the

specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims") (citing *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001)).

The Court does not find it appropriate to limit "central registrar" to computer-based systems. Although the patent only specifically describes embodiments that involve the use of computers, nothing in the claims requires that the central registrar be computerized. Furthermore, unlike in *SciMed Life Systems*, there is no statement in the specification that clearly limits all envisioned embodiments to such a limitation. In that case, the Federal Circuit found that a part of a catheter was limited to "annular" structures and excluded "dual, or side-by-side" arrangements, based on language in the specification that said:

> The intermediate sleeve structure defined above is the basic sleeve structure *for all embodiments of the present invention contemplated and disclosed herein*—namely, an inner core tube bonded to a distal portion of the main catheter shaft, with an outer sleeve forming an annular continuation of the inflation lumen through the main shaft between the core tube and outer sleeve.

*Id.* at 1343 (emphasis added). Absent a clearer statement limiting all embodiments of the patented invention to having computerized central registrars, the Court finds that the specification does not "make clear . . . that the claimed invention is narrowed that the claim language might imply." *Alloc,* 342 F.3d at 1370.[3]

Because the parties agree that the "central registrar" must include registration of the facsimile signature, the Court finds it appropriate to include that in its construction of

---

[3] Similarly, the use of computers in the drawings of figures 4 and 4A of patent only provides examples of preferred embodiments, and thus does not require a limitation of the term "central registrar" to include only computers.

the term. Thus, the Court adopts Defendants' proposed construction with that addition. The term "central registrar" is construed to mean "a primary or essential official recorder or keeper of records, including facsimile signatures, that are available to be retrieved either physically or via electronic means."

### E. "Facsimile Signature"

Plaintiff argues that "facsimile signature" should be construed to mean "a visual representation of the exact, specific signature provided by a principal on a specific item." Defendants argue it should be construed as:

> A comparative replication or example of the principal's signature that can be visually compared by a person, such as a photo, photocopy, computer image, or printed image of the principal's signature; that can include, but is not limited to, an image of the exact, specific signature on the item that is being authenticated; but does not include abstract symbols that require other information, analysis or decoding to be visually compared by a person.

Thus, the fundamental disagreement is whether the facsimile signature may be an *example* of the principal's signature or must be an image of the *exact signature* on the item in question, such as a will or a baseball.

As Plaintiff points out, the "Summary of the Invention" section of the '044 patent contains multiple references to the facsimile signature depicting the exact signature on an item. First, it states:

> The actual signature the Principal has just placed on the Item is encoded into the EF along with the Principal's PIN and Code. When the EF is subsequently read, an exact Facsimile Signature will be displayed on the Agent's computer terminal showing exactly how the actual signature the Principal placed on the Item should look.

In addition, the "Summary of the Invention" section states:

> It is an added forgery deterrent to scan the signature the Principal has just placed on an Item into the EF. No Principal signs his name in exactly the

> same way each time. Even if a forger were somehow able to copy the EF
> placed on an Item in an attempt to commit a forgery, it would be
> impossible for the forger to sign the Principal's name in the exact same
> way that the Facsimile Signature is memorialized in the EF.

*See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention."). The Court acknowledges that the proper weight to be given the first passage is ambiguous, as it is contained within the "Summary of the Invention" but also in a paragraph describing "another preferred embodiment." The second passage, however, appears in a paragraph that does not refer to a preferred embodiment, but instead seems to describe an "added forgery deterrent" of the invention as a whole. The Court finds that the language of the specification "suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003).

Defendants argue that the prosecution history requires that "facsimile signature" be construed to include exemplars. Specifically, they point to a response to the PTO that Plaintiff submitted to distinguish the claimed invention from a patent to Molee, which had included the use of "abstract symbols" for authentication. (*See* Doc. No. 39-10.) In the response, Plaintiff indeed stated that "the facsimile signature provides a comparative example of the person's signatures." (*Id.*)[4] However, a finding that the patentee disclaimed a limitation during the prosecution is only appropriate where the patentee has

---

[4] Defendants also point to two passages in this response in which Plaintiff referred to a facsimile signature as "a replication of the signature of a person." The Court finds that this phrase could plausibly be interpreted to mean either an example of the person's signature *or* a replication of the exact signature on a specific item. Accordingly, the Court does not find the use of this phrase in the prosecution history persuasive.

made "a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). Here, Plaintiff sought to distinguish the use of signatures from that of *abstract symbols*, not to distinguish the use of example signatures from that of specific signatures. It is not clear that the distinction between an exact signature and an example of a signature was relevant in any way to distinguishing the Molee patent. The passing reference to "the facsimile signature provid[ing] a comparative example" does not constitute a "clear and unmistakable disavowal" of the claim scope. Furthermore, Defendants cite no authority in which a prosecution history disclaimer served to *broaden* a claim term that is limited by the specification, rather than *limiting* an otherwise broader claim term. The Court finds that the prosecution history does not alter the meaning of "facsimile signature."

Accordingly, the Court adopts Plaintiff's construction of "facsimile signature": "a visual representation of the exact, specific signature provided by a principal on a specific item."

**F. "Database"**

Plaintiff argues that "database" should be construed as "a computer-based collection of information, organized for search and retrieval by a computer." Defendants argue it should be construed as "a computer-based or non computer-based collection of information." Thus, as with "central registrar," the parties disagree as to whether or not this term should be limited to computer-based systems.

The Court again finds that this term is not limited to computer-based systems. As discussed for "central registrar" above, while the specification refers to preferred embodiments that use computer databases, it contains no statement limiting all

embodiments to those that have computer databases. In addition, two of the preferred embodiments in the specification refer to a "computer database." This suggests that the use of the unqualified word "database" in the patent claims themselves is not limited to computer databases. *See Phillips*, 415 F.3d at 1314 ("the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel"). The specification shows that, had Plaintiff intended to limit the claim term "database" to computer databases, it knew how to do so.

Accordingly, the Court adopts Defendants' proposed construction of "database": "a computer-based or non-computer-based collection of information."

### G. "Identifies"

Plaintiff argues that "identifies" need not be construed. Defendants argue that it should be construed as "establishing the identity of something by showing or proving sameness with something that is known, stated or possessed." Defendants argue that their construction is needed to avoid potential jury confusion of the terms "register" and "identify."

In essence, Defendants seek to add a limitation restricting the method by which something can be identified to "showing or proving sameness with something that is known, stated, or possessed." The Court does not find it appropriate to read that limitation into the term. Claim 15 does refer to "identifying" the principal and the item "through the at least one numbered code" and "maintaining a database by the central registrar that identifies the principal and the item." However, those claim elements do not specify *how* such identification occurs, beyond the use of numbered codes and a central registrar. Even in the descriptions of preferred embodiments cited by Defendants, the

patent only refers to *comparing* signatures as one of the possible methods of identification. (Doc. No. 39-2, at col. 3, ll. 3-6 ("With this preferred embodiment, a subsequent Holder of the Item will be able to not only verify that the Item has an appropriate EF but will also be able to compare the signature found on the Item to the signature encoded in the EF."); *id.* at col. 6, ll. 43-46 ("The Agent **91** can verify the information encoded in the EF **30** and can compare the Signature **11** found on the Will **20** with the Facsimile Signature **33** displayed on the Agent **91** computer.").) It is not clear that Defendants' proposed construction would even include identifications using an electronic fingerprint or code, because such identifications would not show "sameness" of the "something" being identified with anything else, but only the sameness of the code that is associated with the "something" with a code that is "known, stated, and possessed." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (claim construction in which preferred embodiment is outside scope of patent claim "is rarely, if ever, correct").

The Court does not dispute that the identification method proposed by Defendants is implied by the patent claims as a whole, but simply finds that the method is not a limitation of the claim term "identifies." Claims 7 and 15 both include, for example, the requirement of "registering with a central registrar a facsimile signature of a principal," so that element would still be required even if the term "identify" was met using a different method.

The Court does, however, agree with Defendants that there is a potential for confusion between the words "register" and "identify." That danger comes from the fact that ordinary meanings of "identify" can refer either to initial classification (which is

similar to registration) or to verification of identity after registration has occurred. In the context of the claims, it is clear that "identify' refers to the latter meaning. The Court does not find the definition cited by Plaintiff and Defendants ("[t]o establish the identify of") to be sufficiently clear, and instead construes "identifies" as "verifies the identity of." *See* Random House Webster's College Dictionary (2d ed. 2000).[5]

### H. "Certificate of Authenticity"

Plaintiff argues that "certificate of authenticity" should be construed as "a physical statement confirming that a signature on a certain item is the signature of the principal." Defendants seek to add the words "signed, written" before "physical statement" in that definition. In support of their claim, Defendants point to the examples of certificates of authenticity in Figures 2, 2A, and 3 of the patent as well as language in the preferred embodiments of the specification.

The Court finds no reason to read the limitations "signed" and "written" into this term. Although the examples given in the figures contain a signature line, there is nothing in the patent that requires that *every* embodiment include a "signed, written" certificate of authenticity. Therefore, the Court adopts Plaintiff's construction of "certificate of authenticity": "a physical statement confirming that a signature on a certain item is the signature of the principal."

## IV.   CONCLUSION

The Court hereby construes the disputed terms and phrases as follows:

---

[5] The Court looks to this dictionary not as authoritative of the claim term's meaning but as a source phrasing to best describe the meaning of "identify" that is clear from the context of the patent. *See Phillips*, 415 F.3d at 1322-23 (courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").

| Term, Phrase, or Clause | Court's Construction |
|---|---|
| **"A forgery and authentication method for a signature on an item, comprising the steps of:"** (claim 7) | "A forgery deterrent and authentication method for a signature on an item, comprising the steps of:" |
| **"signature"** | "The actual signature of a principal placed on a specific item" |
| **"signing"** | "The act of creating a signature, with or without one or more witnesses present. The mere witnessing by one person of another person signing an item does not itself constitute a 'signing'" |
| **"signed"** | the past tense of "signing" |
| **"registering"** | "Providing information for recordation/storage" |
| **"registered"** | the past tense of "registering" |
| **"central registrar"** | "A primary or essential official recorder or keeper of records, including facsimile signatures, that are available to be retrieved either physically or via electronic means" |

| Term, Phrase, or Clause | Court's Construction |
|---|---|
| **"facsimile signature"** | "A visual representation of the exact, specific signature provided by a principal on a specific item" |
| **"database"** | "A computer-based or non-computer-based collection of information" |
| **"identifies"** | "Verifies the identity of" |
| **"certificate of authenticity"** | "A physical statement confirming that a signature on a certain item is the signature of the principal" |

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 17 day of November, 2010.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE